**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Raymond P. Moore**

Civil Action No. 13-cv-03003-RM

RICKY LEROY BIAS,

    Plaintiff,

v.

CAROLYN W. COLVIN, Acting Commissioner of Social Security,

    Defendant.

---

**ORDER**

---

    This matter is before the Court on Ricky Leroy Bias's ("Plaintiff") request for judicial review pursuant to 42 U.S.C. § 405(g). (ECF No.1.) Plaintiff challenges the final decision of Defendant, Acting Commissioner of the Social Security Administration ("Commissioner"), denying Plaintiff's applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI, respectively, of the Social Security Act.

    Defendant provided the Court with the administrative record. (ECF Nos. 8; 8-1; 8-2; 8-3; 8-4; 8-5; 8-6; 8-7; 8-8; 8-9.) Plaintiff filed an opening brief (ECF No. 11) to which Defendant responded (ECF No. 14). Plaintiff did not file a reply brief in support. (*See generally* Dkt.)

    For the reasons set forth below, the Court vacates the denial of Plaintiff's applications and remands for proceedings consistent with this Order.

I.      BACKGROUND

   A.    **Relevant Medical Evidence**[1]

Plaintiff was born on January 29, 1964, and was 46 years old on his alleged disability onset date of July 22, 2010. (Admin. R. ("Tr.") 15, 28, 261.) Plaintiff has a GED and his record reveals that he has worked, as referenced in the Dictionary of Occupational Titles, as a maintenance supervisor, maintenance repairer, and exterminator. (Tr. 69, 305.)

Plaintiff alleges to have suffered from insulin-dependent diabetes mellitus for years, and medical records indicate that his blood glucose tests showed levels fluctuating from a low of 147 in January, 2009 after treatment, to a high of 314 in May, 2009. (Tr. 374, 376.) In January 2009, Plaintiff reported to his doctor that he had recorded levels around 350 "a couple of times" and over 400 on one occasion. (Tr. 369.) He reported to his treating physician, Dr. Gary Alan Mohr, in September, 2011 that most often his blood glucose levels were often in the 200s. (Tr. 470.) At a follow-up examination in December, 2011, Plaintiff reported to Dr. Mohr that his "blood sugars have been uncontrolled, running high in the AM 250-340/then after 30 units of Humalog and several hours the BS come back to normal range." (Tr. 465.) Medical records completed by William Simon, PAC, on February 11, 2008, requesting approval of payment for diabetes test strips from Plaintiff's insurance company stated that Plaintiff needed to "use 3-5 test strips/day to [measure] blood glucose levels," and that this therapy would last "for the rest of his life." (Tr. 382.)

Plaintiff also suffers from diabetic polyneuropathy that stems from his diabetes. (Tr. 468, 472.) Plaintiff was diagnosed with neuropathy in January, 2010 by Dr. Bradley Smith. (Tr. 389.) Then, on September 17, 2010, Dr. Mohr also diagnosed Plaintiff with "Diabetes mellitus Type II with significant neuropathy." (Tr. 409.) In September, 2011, Dr. Mohr advised

---

[1] The Court will not discuss impairments or conditions that are not at issue in Plaintiff's opening brief.

Plaintiff: "You do have neuropathy in both feet as substantiated . . . by my clinical exam. Your neuropathy does significantly impair your ability to walk, stand and even sit, according to your history, and your exam is consistent with that." (Tr. 473.) Dr. Mohr further stated that "[u]nfortunately you have been intolerant of nerontin (gabapentin) and Lyrica (pregabalin); we increase your dose of amitriptyline so we can improve symptom control without more narcotics." (Tr. 473) At times, Plaintiff reported his medication and diabetic neuropathy "counfound[ed]" his treatment for other ailments. (Tr. 407.) For example, in January, 2009, Plaintiff's neuropathy was documented in an evaluation of his lower extremities that revealed "diminished pulses, dorsalis pedis and posterior tibialis, more on left than right with decreased sensation with filament test, left foot more laterally than medial." (Tr. 369.) Likewise, in February, 2011, Dr. Adam Summerlin, a consultative examiner, observed that Plaintiff's "tandem walk is antalgic and slow, favoring the left. The claimant is unable to do toe-heel, but Romberg is negative." (Tr. 452.) Dr. Summerlin also noted "[d]ecreased light touch and pinprick in the bilateral legs, from just above the knee to the toes." (Tr. 454.)

      Plaintiff also suffers from gout. (Tr. 409.) On September 17, 2010, Dr. Mohr observed that Plaintiff's left great toe was swollen and tender to palpitation. (Tr. 409.) Dr. Mohr noted "[l]eft foot great to 1st meta tarsal pain, improved but not resolved. Blood uric acid within normal limits as of August of this year." (Tr. 409) In February, 2011, the consultative examiner, Dr. Summerlin, also observed "marked swelling around the left forefoot, particularly involving the metatarsal phalangeal joint of the first toe." (Tr. 453.)

      Additionally, Plaintiff has difficulties and pain in his right foot "with callused ulcerated skin and 4-5th metatarsal pain." (Tr. 409.) Doctors determined that the problem was the result of a prominent bone in his foot. Otherwise his skin around his foot was in good condition with

no dysvascular change.  (Tr. 430.)  On October 27, 2010, Plaintiff underwent surgery to shave the bone in his foot, and afterwards reported having less pain than before.  (Tr. 431-36.)

In September, 2010, Plaintiff went to Dr. Mohr complaining of "[b]lured vision, right, hard to close OD, O eye pain" and "paralysis R side of face x 2 days/CCM.  Feels numb on the right side of face."  (Tr. 403.)  Plaintiff was referred for an MRI, which had normal results.  (Tr. 415.)  Dr. Mohr concluded, "Bell's Palsy seems more likely now," and "he has a headache and pain behind the right ear at '5' on the pain scale, numbness continues."  (Tr. 415)  Plaintiff was referred to Dr. Rawat, a neurologist who concurred that Plaintiff had Bell's Palsy, but that Plaintiff's diabetes would "obviously" complicate his treatment regimen.  (Tr. 423.)

His Bell's palsy also caused Plaintiff to develop eye problems.  At an eye examination in April of 2011, his visual acuity was 20/400 on the right and 20/25 on the left.  Scott M. Smetana, M.D., the eye doctor, believed that "the decreased vision in Rick's right eye must be due to exposure keratopathy, despite unimpressive findings on his examination."  (Tr. 460.)  Plaintiff was able to close his right eye, but only "forcefully."  (Tr. 460)

On February 26, 2011, Plaintiff underwent a functional capacity examination with Dr. Summerlin.  (Tr. 450-54.)  Dr. Summerlin diagnosed Plaintiff with diabetic neuropathy and gout of the left foot.  (Tr. 454.)  Dr. Summerlin stated that Plaintiff had a maximum standing/walking capacity of "[u]p to four hours, due to diabetic neuropathy of the feet and gout of the left foot."  (Tr. 454.)  The doctor opined that the maximum weight that Plaintiff could lift and carry was "20 pounds occasionally, 10 pounds frequently."  (Tr. 454.)  He also found that "[c]laimant should be limited from climbing and balancing due to diabetic neuropathy in his feet," but found that Plaintiff had no restrictions to his ability to stoop, kneel, crouch or crawl.  (Tr. 454.)

In September, 2011, Plaintiff asked his treating physician, Dr. Mohr, to fill out a

4

functional capacity evaluation.  Dr. Mohr declined, writing that he "cannot do that" and referred Plaintiff to a physical therapist for this evaluation.  (Tr. 473.)

In January, 2012, Barry Brown, a physical therapist, completed an extensive functional capacity evaluation of Plaintiff.  (Tr. 474-504.)  After conducting an examination that spanned approximately five hours, beginning at 8:30 AM and concluding at 1:30 PM and involving numerous physical tests, Mr. Brown determined that Plaintiff gave a reliable effort in his testing.  (Tr. 474-504.)  Mr. Brown observed that Plaintiff

> demonstrated a consistent significant right antalgic gait.  He avoided pressure and load to the right lower extremity throughout the evaluation.  He constantly changed position from weightbearing to nonweightbearing and on a couple of occasions slowly walked around for about 3 minutes.  He was observed having difficulty transferring sit to stand using his hands to assist.  He struggled getting up and down the steps.  He has significant difficulty with low level activity.  Due to the type and amount of medication his heart rate should not be used as a predictor to help determine validity.  However, his heart rate did increase with the more physically demanding activity.  Mr. Bias demonstrated signs and symptoms of acute pain and distress in terms of his lower extremity.  He was observed to remove his shoe on the right and rub the foot.  In addition, he would lift the right foot off the ground to reduce weight to the foot.  There were several test components we were not able to complete due to inability so are not included with consistency and reliability.  Although there was one inconsistency noted on the completed tests, overall, the patient's effort was consistent and maximal and his demonstrated abilities should be considered an accurate representation of his true abilities on this date.

(Tr. 474.)  Mr. Brown found that Plaintiff could perform the mid lift and the low lift in the "medium category," and the high lift and the full lift in the "light category."  (Tr. 474.)  Mr. Brown concluded that Plaintiff could frequently finger and sit, but that he could only occasionally walk, kneel, reach immediately or overhead, climb stairs or stand.  (Tr. 474.)  Mr. Brown concluded of Plaintiff that

> due to his limited non material handling tolerance he does not meet the demand and in fact does not meet the definition of Sedentary work since he has significant difficulty sitting for long periods of time and difficulty with locomotion/movement of his own body.  Most importantly while he was here his blood sugar levels reached 247. I would be most concerned about his general

5

health rather than his physical ability. I do not believe Plaintiff is safe to employ for an 8 hour work day.

(Tr. 475.) Mr. Brown included a Functional Abilities Summary detailing the results of the many tests he administered to Plaintiff. (Tr. 476-89.) He also filled in a "Medical Opinion Regarding Ability to Do Work-Related Activities (Physical)" form. (Tr. 500-04.)

B.    **Plaintiff's Testimony at The May 7, 2013 Hearing and The ALJ's Decision**

Plaintiff testified before Administrative Law Judge William Musseman ("ALJ") at a hearing held on May 7, 2013. (Tr. 36-73.) At the hearing, Plaintiff first recounted the symptoms he experienced that rendered him unable to work a full-time job. Among other things, Plaintiff first mentioned the pain in his feet and legs as prohibiting him from working. (Tr. 39.) Plaintiff stated that he was unable to stand for more than twenty minutes without having to sit down and that he could not do that more than once or twice a day. (Tr. 40.) Plaintiff also testified that his legs would cramp up so that he could hardly move them if he sat for too long at one time. (Tr. 40.) Plaintiff's attorney asked him if he could perform the following functions: standing or walking for a combined four hours a day, standing for two hours, walking for two hours, and sitting for two hours a day. (Tr. 40.) Plaintiff replied that he could not do this, because standing is really difficult for him, since both of his legs "cramp up, . . . like charley horses from your feet all the way up to your groin section." (Tr. 41.) Plaintiff stated that this happens five or six times a day for up to two hours at a time. (Tr. 42.) He also testified that it sometimes helped when he got up and walked. (Tr. 42) Plaintiff also testified that he could not kneel and crawl, having a hard time "getting down at all." (Tr. 43.)

Plaintiff mentioned that he had difficulty with his vision since he had Bell's Palsy, and that although most of his vision had returned, it was still "a little bit . . . blurry." (Tr. 44.) He testified that his wife did most of the driving, at first because of his vision, and then, after his

6

vision improved, because of the pain and difficulty feeling the pedals with his legs and feet. (Tr. 44-45.) Plaintiff also stated that he had difficulty climbing the two small steps into his home and had to use the handrail. (Tr. 46.)

Plaintiff testified that some of his medications, especially amitriptyline and oxycodone make him drowsy. (Tr. 47.) He stated that he takes up to six oxycodone a day. (Tr. 48.) Plaintiff also stated that he relied on his wife for reminders to take his medication and also for other things, like to get up and move periodically, so he did not cramp up. (Tr. 48-49.)

Plaintiff testified that his condition had gotten worse since his alleged onset date of July 22, 2010. (Tr. 50.) Plaintiff stated that he had to get up and move around during a thirty-minute television show. (Tr. 51-52.) He also stated that he needed to take bathroom breaks about three times every hour. (Tr. 52.) Plaintiff did not believe he could do a job where he would sit for two hours, and then take a fifteen-minute or lunch break throughout an eight hour day, because he could not sit for that long. (Tr. 53.) If he were able to sit and stand in one location he thought he could do the job for one day, but would not be able to get up the next day because of the pain in his legs. (Tr. 53-54.)

Plaintiff testified that he did not do any yard work, and that he did not do any mechanical work around the house. (Tr. 54.) He mentioned that he had two dogs but that he did not walk them or do much to take care of them. (Tr. 54) Plaintiff further testified that he had difficulty with his personal care, and specifically that he could no longer get in and out of the bathtub and needed a chair in the shower. (Tr. 57-58.) Plaintiff also stated that he took three or four naps spread out over the course of the day for twenty-five minutes to half an hour at a time. (Tr. 59.) He stated that the amitriptyline he takes to treat his neuropathy causes drowsiness. (Tr. 59-60.) He stated that he took this medication about twice a day, although sometimes more often, since it

was prescribed to be taken as needed. (Tr. 59-60.)

Discussing his diabetes, Plaintiff testified that his blood sugar reading the morning of the hearing had been 350, but that was abnormally high. (Tr. 62.) He stated that a normal morning reading for him was 230 or 240. (Tr. 62.) Plaintiff stated that when his blood sugar rose to the 350 range he had problem with his vision, the pain in his legs worsened, and he had difficulty breathing, and that these readings would occur ten or twelve times per month. (Tr. 63.) When Plaintiff's blood sugar rose to the range of 350, he takes Metformin or other medications and his blood sugar responds within a couple hours. (Tr. 63.) Plaintiff testified that he was compliant with his diabetes treatment regimen. (Tr. 63-64.)

The ALJ then examined the vocational expert. Specifically, the ALJ posed to the vocational expert the following hypothetical:

> assume an individual the same age and educational background as the claimant, limited to an exertional level and a modified range of "sedentary." Modification being a sit/stand option, able to alternate at will, but alternating would not take them off task. Occasional squatting/kneeling. No below knee level work. Allow for occasional stair climbing, no ladders or scaffolds, no uneven terrain, no hazardous work areas, no foot or leg controls

(Tr. 69.) The vocational expert responded that these hypothetical conditions would not permit Plaintiff to return to his former occupation, but that other jobs did exist in the Colorado and national economy that Plaintiff could perform adequately. (Tr. 69.) The ALJ then posed a second hypothetical building on the first:

> Assume the restrictions I gave you in the first hypothetical, plus add additional limitation as testified to by the claimant in this matter of on a daily basis, a need to be off task either to the neuropathy cramps and pains or the need to lay down, would be off task 50 percent of the day.

(Tr. 70.) To this hypothetical, the vocational expert testified that such limitations would not be tolerated in any competitive work environment. (Tr. 70.)

On May 17, 2013, the ALJ issued a decision finding that Plaintiff was not disabled under

8

the Act. (Tr. 9-29.) Citing 20 C.F.R. §§ 404.1520(c) and 416.920(c), the ALJ determined that Plaintiff had the following severe impairments: "gout; Bell's Palsy; and diabetes with diabetic neuropathy." (Tr. 15.) The ALJ also found that Plaintiff did not have any impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 17.)

The ALJ then found that Plaintiff had the residual functional capacity ("RFC") to perform sedentary work, as defined in 20 C.F.R. 404.1567(a) and 416.967(a). (Tr. 18.) The ALJ clarified that

> [s]uch work involves a sit/stand option where the claimant can alternate at will, and it (alternating) will not take him off task. He can squat, kneel, and climb stairs occasionally. The work involves no below knee-level work, no ladders or scaffolds, no uneven terrain, no hazardous work areas, and no foot or leg controls.

(Tr. 18.)

With regard to the functional capacity evaluations Plaintiff received from various treatment providers, the ALJ credited the exertional limitations assessed by Dr. Summerlin. (Tr. 25.) The ALJ also credited the limitations listed by the state agency medical consultant, Dr. Paul Barrett, that were found based upon a review of Dr. Summerlin's notes. (Tr. 25.) The ALJ found that both Dr. Summerlin's and Dr. Barrett's opinions were "well supported and consistent with the record as a whole." (Tr. 26.)

The ALJ gave no weight to the findings of Dr. Mohr, Plaintiff's treating physician. (Tr. 26.) The ALJ based this conclusion, in part, on the ALJ's determination that Dr. Mohr's opinion was inconsistent with those of a foot specialist and neurologist that both treated Plaintiff. (Tr. 26.) The ALJ also based his determination on "Dr. Mohr's own admission in his statement" that his opinion "was based on what the claimant reported to him (i.e. his history) rather than on any objective evidence or clinical findings." (Tr. 26.)

9

The ALJ also declined to give any weight to the results of the functional capacity examination conducted by Mr. Brown. (Tr. 26-27.) The ALJ based this not only on the fact that Mr. Brown is not an "acceptable medical source," but also because he said that Mr. Brown "relied quite heavily on the subjective reporting of symptoms and limitations provided by the claimant." (Tr. 26-27.) The ALJ also noted that the findings from the treating foot specialist and the neurologist do not support Mr. Brown's findings. (Tr. 27.)

The ALJ found that Plaintiff was not able to perform any of his past relevant work, but that he could perform the jobs of telephone sales, dispatcher maintenance, and appointment clerk. (Tr. 28-29.) He based this conclusion on the testimony received by the vocational expert at the May 7, 2013 hearing. Citing 20 C.F.R. §§ 404.1520(g) and 416.920(g), the ALJ concluded that Plaintiff had not been under a disability from his alleged onset date of July 22, 2010, through the date of the decision. (Tr. 29.)

## II. LEGAL STANDARDS[2]

### A. Standard of Review

The Court reviews the Commissioner's decision to determine whether substantial evidence in the record as a whole supports the factual findings and whether the correct legal standards were applied. *Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009). Substantial evidence is evidence that a reasonable mind might accept as adequate to support a conclusion. *Id*. "It requires more than a scintilla, but less than preponderance." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007).

Although a district court will "not reweigh the evidence or retry the case," it "meticulously examine[s] the record as a whole, including anything that may undercut or detract

---

[2] Many C.F.R. citations are to part 404—which addresses DIB claims. All cited regulations have parallel citations in part 416—which addresses SSI claims.

10

from the ALJ's findings in order to determine if the substantiality test has been met." *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007); *see also* 42 U.S.C. § 405(g). Evidence is not substantial if it is overwhelmed by other evidence in the record. *Grogan v. Barnhart*, 399 F.3d 1257, 1261-62 (10th Cir. 2005). In reviewing the Commissioner's decision, the Court may not substitute its judgment for that of the agency. *Salazar v. Barnhart*, 468 F.3d 615, 621 (10th Cir. 2006). As the Tenth Circuit Court of Appeals observed in *Baca v. Dep't of Health & Human Servs.*, 5 F.3d 476 (10th Cir. 1993), the ALJ also has a basic duty of inquiry to "fully and fairly develop the record as to material issues." *Id.* at 479-480 (citations omitted). This duty exists even when the claimant is represented by counsel. *Id.* at 480 (citation omitted).

Also, "[t]he failure to apply the correct legal standard or to provide [a reviewing] court with a sufficient basis to determine that appropriate legal principles have been followed is grounds for reversal." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005) (citation and internal quotation marks omitted); *see also Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996) ("[T]he Secretary's failure to apply the correct legal standards, or to show us that [he] has done so, are . . . grounds for reversal.").

### B. Evaluation of Disability

The criteria to obtain DIB under Title II of the Act are that a claimant meets the insured status requirements, is younger than 65 years of age, files an application for a period of disability, and is under a "disability" as defined under Title II of the Act. 42 U.S.C. §§ 416(i), 423(a); *Flint v. Sullivan*, 951 F.2d 264, 267 (10th Cir. 1991). In addition, the individual's disability must have begun before his or her disability-insured status has expired. 20 C.F.R. § 404.101; Social Security Ruling ("SSR") 83-10, 1983 WL 31251, at *8 (1983).

The criteria for SSI payments under Title XVI of the Act are determined on the basis of the individual's income, resources, and other relevant characteristics. 42 U.S.C. § 1382(c)(1). In addition to being financially eligible, the individual must file an application for SSI and be under a disability as defined in the Act. 42 U.S.C. § 1382.

The Act defines "disability" as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment [that] can be expected to result in death or [that] has lasted or can be expected to last for a continuous period of not [fewer] than twelve months." 42 U.S.C. § 1382c(a)(3)(A) (definition for benefits under SSI); *see also* 42 U.S.C. § 423(d)(2)(A) (definition for benefits under DIB); *Barnhart v. Walton*, 535 U.S. 212, 214-15 (2002).

There is a five-step sequent for evaluating a disability. *See* 20 C.F.R. §§ 404.1520, 416.920(a)(4); *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987) (describing five-step analysis). If it is determined that a claimant is or is not disabled at any point in the analysis, the analysis ends. *Casias v. Sec'y of Health & Human Servs.*, 933 F.2d 799, 801 (10th Cir. 1991). First, the claimant must demonstrate that he or she is not currently involved in any substantial, gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(a)(4)(i). Second, the claimant must show a medically severe impairment or combination of impairments that significantly limits his or her physical or mental ability to do basic work activities. *Id.* at §§ 404.1520(c), 416.920(a)(4)(ii). Third, if the impairment matches or is equivalent to an established listing under the governing regulations, the claimant is judged conclusively disabled. *Id.* at §§ 404.1520(d), 416.920(a)(4)(iii). If the claimant's impairment does not match or is not equivalent to an established listing, the analysis proceeds to the fourth step. Fourth, the claimant must show that the "impairment prevents [him or her] from performing work [he or she] has performed in the

past." *Williams v. Bowen*, 844 F.2d 748, 751 (10th Cir. 1988) (citations omitted); *accord* 20 C.F.R. §§ 404.1520(f), 416.920(a)(4)(iv). If the claimant is able to perform his or her previous work, he or she is not disabled. 20 C.F.R. §§ 404.1520(f), 416.920(a)(4)(iv). Fifth, the Commissioner must demonstrate: (1) that based on the claimant's residual functional capacity ("RFC"), age, education, and work experience, the claimant can perform other work; and (2) the work that the claimant can perform is available in significant numbers in the national economy. *Frey v. Bowen*, 816 F.2d 508, 512 (10th Cir. 1987); *see also* 20 C.F.R. §§ 404.1520(g), 416.920(a)(4)(v).

### III.  ANALYSIS[3]

Plaintiff argues that the ALJ failed to determine properly Plaintiff's RFC both by failing to give proper consideration to the medical source opinions contained in the record and by improperly evaluating Plaintiff's credibility. (ECF No. 11 at 19-23.) Plaintiff further argues that the ALJ failed to consider the effects of Plaintiff's non-severe impairments and non-exertional limitations in fashioning Plaintiff's RFC. (ECF No. 11 at 23-25.) Plaintiff further argues that the Commissioner did not meet its burden at step five of showing that there were occupations existing in significant numbers in the national economy that Plaintiff could perform. (ECF No. 11 at 26-28.)

Because the Court finds the ALJ committed legal error due to his failure to discuss adequately all of Plaintiff's medically determinable impairments in making his RFC determination, the Court VACATES Defendant's decision.

Because this error alone requires remand, the Court does not address the other arguments raised by Plaintiff. *See Madrid v. Barnhart*, 447 F.3d 788, 792 (10th Cir. 2006) (when the ALJ's error affected the analysis as a whole, the court declined to address other issues raised on

---

[3] The Court considers only those issues adequately raised in Plaintiff's opening brief. *Wall*, 561 F.3d at 1066-67.

appeal); *Watkins v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003) ("We will not reach the remaining issues raised by appellant because they may be affected by the ALJ's treatment of this case on remand."). The Court expresses no opinion as to Plaintiff's other arguments and neither party should take the Court's silence as tacit approval or disapproval of how the evidence was considered. The Court does not intend, by the opinion, to suggest the result that should be reached on remand; rather, the Court encourages the parties (as well as the ALJ) to consider all of the evidence and the issues anew.

  A. **The ALJ Committed Reversible Error by Not Providing the Court with an Explanation as to How He Considered All of Plaintiff's Medically Determinable Impairments in Fashioning Plaintiff's RFC.**

Plaintiff argues that the ALJ failed to account for Plaintiff's diabetes, specifically Plaintiff's need to check his insulin levels in fashioning the RFC. (ECF No. 11 at 23-25.) The Court finds Plaintiff's argument persuasive.

"When a claimant has one or more severe impairments the Social Security [Act] requires the [Commissioner] to consider the combined effects of the impairments in making a disability determination." *Campbell v. Bowen*, 822 F.2d 1518, 1521 (10th Cir. 1987) (citing 42 U.S.C. § 423(d)(2)(C)). In the RFC assessment, the ALJ must consider the combined effect of *all* medically determinable impairments, whether severe or not." *Wells v. Colvin*, 727 F.3d 1061, 1065 (10th Cir. 2013) (citing 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2)).

The RFC assessment is made by the ALJ "based on all the relevant evidence in [the claimant's] case record." 20 C.F.R. § 404.1545(a)(1). The RFC is an assessment of the most a claimant can do despite his or her limitations. *Id*. The RFC is "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p (July 2, 1996), 1996 WL 374184, at *1; *see also Haga v.*

*Astrue*, 482 F.3d 1205, 1208 (10th Cir. 2007) (citing 20 C.F.R. § 416.945(c)).  A "regular and continuing basis" means "'8 hours a day, for 5 days a week, or an equivalent work schedule,' SSR 96-8p, 1996 WL 374184, at *2, and to 'respond appropriately to supervision, coworkers, and customary work pressures in a routine work setting,' SSR 86-8, 1996 WL 68636, at *5." *Haga*, 482 F.3d at 1208.  Examples of the types of evidence required to be considered in making an RFC assessment are the claimant's medical history, medical signs, laboratory findings, effects of treatment, reports of daily activities, lay evidence, recorded observations, medical source statements, effects of symptoms, evidence from attempts to work, need for a structured living environment, and work evaluations.  SSR 96-8p, 1996 WL 374184, at *5.  An ALJ must make "specific" RFC findings based on all of the relevant evidence in the case record.  *See Winfrey*, 92 F.3d at 1023, 1025.

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence . . . the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis . . . and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record.  The *adjudicator must also explain how any material inconsistencies or ambiguities* in the evidence in the case record were considered and resolved.

1996 WL 374184, at *7 (emphasis added).  The ALJ's findings regarding a claimant's RFC must be supported by substantial evidence.  *See Hadock v. Apfel*, 196 F.3d 1084, 1088 (10th Cir. 1999).

In developing the RFC, the ALJ must consider the limiting effects of all the claimant's impairments.  20 C.F.R. § 416.945(a)(2); *see also Bowman v Astrue*, 511 F.3d 1270, 1272-73 (10th Cir. 2008).  In doing so, the ALJ "'must address both the remaining exertional and nonexertional capacities of the individual." *Southard v. Barnhart*, 72 F. App'x 781, 784 (10th Cir. 2003) (citation omitted).  There is no requirement for a direct correspondence between an

15

RFC finding and a specific medical opinion on the functional capacity in question. *Chapo v. Astrue*, 682 F.3d 1285, 1288 (10th Cir. 2012).

In this matter, the ALJ found Plaintiff has, in pertinent part, the following severe impairment: "diabetes with diabetic neuropathy." (Tr. 15.) Plaintiff alleged that his diabetes impairment is separate from his diabetic neuropathy. (Tr. 115, 304.) Plaintiff argues the need for him to "test[] his blood, administer[] insulin and/or eat[] or drink[] to adjust his glucose levels" constitutes a non-exertional limitation as a result of his diabetes for which the ALJ should have accounted in his RFC determination. (ECF No. 11 at 25.) Defendant does not respond to Plaintiff's argument. (*See generally* ECF No. 14.)

The ALJ acknowledged that Plaintiff alleged he "needs to check his insulin levels 5-6 times a day, and take insulin 5-6 times a day to control" his diabetes. (Tr. 19.) In fashioning the RFC, the ALJ considered Plaintiff's diabetes and found it to be "well controlled on medication." (Tr. 25.) The ALJ further found Plaintiff's "diabetes [to be] apparently longstanding in nature, with no evidence of any progression . . . since his alleged onset date." (Tr. 20.) Additionally, the ALJ found that "other than some minor adjustments in [Plaintiff's] diabetes medication, it does not appear that the [Plaintiff's] prescribed medication has been adjusted in any way, suggesting that overall his condition has remained stable." (Tr. 23.)

Whether Plaintiff's diabetes is well controlled and whether Plaintiff has any limitations on his residual functional capacity are distinct inquiries. The mere presence of a condition—without any demonstrable work-related impact—will not support a disability claim. *See Hinkle v. Apfel*, 132 F.3d 1349, 1352 (10th Cir. 1997); *see also* 20 C.F.R. § 404.1521(b). But there is evidence that Plaintiff's diabetes imposes work-related impairments. Plaintiff testified that when his blood sugar level spikes to 350 (his normal morning reading is 230, 240), he notices

difficulty with his vision, it becomes harder to breathe, and his legs hurt worse. (Tr. 62-63.) In response to his blood sugar level spiking, Plaintiff then takes Metformin or another medication to which his blood sugar responds "within a couple hours." (Tr. 63.) And ten to twelve times a month, Plaintiff's blood sugar levels spike to as high as 350. (Tr. 63.)

> The ALJ used boilerplate language. Specifically the ALJ, in fashioning the RFC, stated
>
> > the undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and SSRs 96-4p and 96-7p. The undersigned has also considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and SSRs 96-2p, 96-5p, 96-6p and 06-3p.

(Tr. 18.) Further, the ALJ states that "[d]espite claiming extreme limitations in his exertional capacities and stamina, the record provides no consistent and convincing evidence over time, and the undersigned cannot find the testimony and alleged limitations of the [Plaintiff] to be well supported." (Tr. 23.) The Tenth Circuit, however, has rejected such boilerplate language. *Hardin v. Barnhart*, 362 F.3d 676, 679 (10th Cir. 2004). The ALJ must explain why specific evidence led him to his RFC determination. *See Hardin*, 362 F.3d at 679; *see also Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995). The ALJ's blanket statement that he considered all of the evidence fails to inform the Court, in a meaningful and reviewable way, of the specific evidence the ALJ considered in determining Plaintiff's diabetes complaints were not credible and thus, did not need to be included in the RFC or that they were accounted for in the RFC. *See Hardin*, 362 F.3d at 679.

The RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence. *See* SSR 96-8p, 1996 WL 374184, at *7. The ALJ's RFC assessment in this matter fails to comply with this directive with respect to Plaintiff's diabetes

and the need to check his blood-sugar levels and take insulin when his blood sugar levels spike. (*See generally* Tr. 18-27.) The ALJ's analysis does not indicate how or whether Plaintiff's need to measure blood sugar and give himself insulin shots would impact his work productivity or schedule. Nor does the ALJ's analysis consider the physical consequences of abnormally high blood sugar readings which reportedly occur ten or twelve times per month. Thus, the ALJ's analysis is deficient. *See Satterfield v. Colvin*, Case No. 2:13-CV-00981-EJF, 2015 WL 3672524, *11 (D. Utah June 15, 2015); *see also Boehnke v. Colvin*, Case No. 12-CV-6629 (MAT), 2014 WL 1315552, *7-9 (W.D.N.Y. Mar. 28, 2014).

The ALJ erred in not providing an adequate discussion as to how the RFC accounts for Plaintiff's diabetes impairment[4]. *See Drapeau v. Massanari*, 255 F.3d 1211, 1214 (10th Cir. 2001) (holding that when an ALJ does not provide an explanation for rejecting medical evidence, the Court cannot meaningfully review the ALJ's determination). Even if the ALJ were to have outright rejected Plaintiff's credibility with respect to the diabetes impairment complaints, *i.e.*, the need to check his insulin levels 5-6 times a day and that spikes in his blood sugar levels cause breathing problems (Tr. 62-63, 318), the Court requires the ALJ to discuss the uncontroverted and "significantly probative evidence he rejects." *Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir. 2008) (quoting *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996)). The ALJ did not do so in this matter. (*See generally* Tr. 18-27.) Rather the ALJ stated in a conclusory fashion, that he "has considered all of the [Plaintiff's] statements concerning his limitations, but

---

[4] A corollary issue raised by Plaintiff's testimony (though not raised by Plaintiff in his opening brief), is whether the ALJ failed to develop the record adequately. "In a social security disability case, the claimant bears the burden to prove [his] disability." *Wall*, 561 F.3d at 1062 (quoting *Flaherty*, 515 F.3d at 1071). But an ALJ has a duty to ensure that an adequate record is developed during the disability hearing consistent with the issues raised. *Id*. at 1062-63 (internal quotation and citation omitted). In this matter, Plaintiff's testimony raised an issue as to whether his diabetes, *i.e.*, his blood-sugar level spikes and resultant effects, cause work-related limitations. That is, there is no record evidence as to the number of breaks Plaintiff requires to check his insulin, the length of those breaks, the timing of those breaks, and the timing of administering insulin. The ALJ did not question Plaintiff as to this matter. (*See generally* Tr. 36-73.) The ALJ had an obligation to make a finding as to Plaintiff's limitations related solely to diabetes as distinguished from diabetic neuropathy.

cannot find his complaints to be *entirely* credible in light of the evidence of record." (Tr. 27 (emphasis added).) Thus, the Court is left to guess as to what the ALJ considered credible and not credible with respect to Plaintiff's diabetes-related limitations.

The ALJ's decision must be evaluated "based solely on the reasons given stated in the decision." *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004). Specific to Plaintiff's complaints of diabetes induced breathing problems which occur ten to twelve times a month which cause a work-related limitation, the ALJ gave no reason for rejecting such testimony.

**IV. CONCLUSION**

Based on the foregoing, the Court:

(1) VACATES Defendant's denial of disability insurance benefits and supplemental security income; and

(2) REMANDS to Defendant for further proceedings as directed in this Order pursuant to sentence four in 42 U.S.C. § 405(g).

Dated this 8th day of March, 2016

BY THE COURT:

RAYMOND P. MOORE
United States District Judge